The second case is United States v. Halston. The third case is United States v. Halston. The main point that I wanted to take this opportunity to do is to talk about the context within which Robert Halston armed himself, because although it's clear to me that the cases taken as a whole do not favor my client primarily in terms of the immediacy of the harm that the cases seem to talk about, getting into an altercation outside of a bar where you grab a gun to protect yourself or other types of altercations, what I think is important about this case is to put it in the context of what goes on in a major metropolitan city like Philadelphia where victims typically fear for their lives and where law enforcement has a legitimate concern in protecting people who are willing to come forward and testify for the purpose of justice being done. In this case, the context, as you know, in 2001, Robert Halston testified against two men who shot him, who shot the man, and he was a convicted felon. In 2005, I believe it was 2005, he was basically trying as best he could, I submit to you, to put his life back together, he was trying to work, he had a child that he testified that he would take her to school, and he was trying to go about his life as best he could within the circumstances of his life, and he ran into one of the two men who shot him, and heard that that man was going to quote, get him, unquote. Now, that was not, I recognize that was not an immediate threat, for example, in the Pallello case, we have the altercation outside the bar, in other cases that my colleague, Mr. Henson, has made reference to, but this is a man who knows he's been shot before, he is trying to live his life in a normal manner, and certainly is fearful when he experiences that, and I would suggest to you that having somebody say I'm going to get him in your presence after they've previously shot you, is more than just what my colleague refers to as a generalized fear, it's something that victims and people who come forward and testify for the commonwealth and the state of Pennsylvania experience in very real terms, and I submit to you... Although don't, I mean this is, you're asking for a defense to gun possession, asking for the fact that you're possessing a gun to be totally excused, as a policy matter, one of the problems in our society is threats are abounding, and this one, we're not even sure if it was directed at him, threats go on all the time, and threats are made, if we allow people to arm themselves and be excused from punishment for doing so, when threats are made other than threats that implicate almost the voluntariness of the action, don't we have a real problem? It is, it is, and the more I read through the case, I mean I understand why the court would be concerned to really narrow this down, I can understand that, I guess all I'm saying is that maybe, maybe, maybe when you're talking about somebody who has previously been attacked by someone, that maybe there needs to be a more elastic approach to applying the four For example, an immediate emergency, there has to be an immediate emergency, well, this is not an immediate emergency as in Tolello and others. You correctly identified the difficulty here, which is drawing the line, because as Judge Rendell said, anyone who lives in a neighborhood where guns are prevalent, and who may have been the victim of either an assault or a threat, would have a legitimate reason for saying, look, somebody's out to get me, and I should be able to carry a gun, and how do you enforce these illegal possession laws if everyone can claim that as a legitimate defense? But what if, in trying to figure out what the boundaries are, how, there obviously have to be some sort of temporal boundaries, I mean, what if he were picked up a month later, or two months later after he'd heard the threat, or three months later, he's still wearing a flak jacket, and he's carrying a gun, would that be okay, or are you just saying we have to look at each case as individual, and? No, I don't think that would be okay, but in this case, you're talking about a temporal boundary that was within the 24-hour period, I think far less than that. So I'm wondering if maybe, what he was asking for, obviously, is to let a jury decide, that's what he was asking to do, to explain this to a jury and let them decide, but no, no, the answer is no. And the government's fear is that a jury is going to be, juries will be sympathetic if people live in high-crime areas, and they're going to say, well, they're just not going to enforce illegal drug, gun prosecutions. Right, right. I understand, Your Honor, and I think, you know, when I go through each one of these four factors, I keep running into the same problem, you know, the courts, the need to I'll end with it, is that in this case, this man, he suffered this consequence because he did the right thing, he testified for the Commonwealth, he put himself on the line after getting shot, tried to do the right thing, both at a preliminary hearing and he came forward at trial, that's the one factor in the context within which we live here in this city that I thought might be worth raising the issue, and that's why I raised it, and I thank you very much. Let me ask you a question, in sentencing, would this, would there be any way in sentencing this could be taken into account, that the reason, you know, the reason he did this was not for a lawless purpose, but as a matter of defense, I mean, that could be raised as sentencing, could it not? I assume. I think it should. It wasn't at the time. And these days, in 3553, you can figure that he may not be your run-of-the-mill gun possessor because of this situation, I'm not sure. I think we did, as a matter of fact, but I think that Judge Davis just felt so circumscribed by, you know, he had already made the finding on the motion, that I think, I really believe if he believed that he had the authority to do that, he would. It almost appeared to me that he wanted to at the time, and I didn't even think the government was, I mean, I thought that the government was basically, not going through the motions, but I mean, they didn't ask for anything more than what they got at the sentencing. I didn't sense that the government was all that vehement about seeking, you know, the imposition of the mandatory minimum that he received. But the opportunity didn't seem to be available to us, so that was fine. A question on the timing. There's lots of dates in the brief as to what happened. There was a preliminary hearing that he testified on November 2001, and then the gun possession arrest was September of 2002. The gun possession arrest for my client? Yes. Yes, I believe that's correct. Because there was reference to a preliminary hearing in December of 2002 and a trial in 2003. I assume they were... Well, the gun possession arrest was later than that, Your Honor. I think it might have been in 2005, if I'm not mistaken. Okay. All right. We'll have to look back. Thank you. Thank you. Good. Thank you, Mr. Menchel. We'll give you some additional time if you'd like it on rebuttal. Thank you very much, Your Honor. Good. Mr. Henson. Court, please. I'm Eric Henson, Assistant United States Attorney for the government. With respect to Judge Rendell, to the last question, I think there's a typographical error in the defense brief. The preliminary hearing was at the end of 2002. The trial, 2001, the trial was in January of 2002, and then approximately eight months later in September of 2002, the defendant was caught with a gun in this case. Thank you. The very purpose of the felon possession statute is to keep firearms out of the hands of irresponsible and dangerous persons. The place where the deterrent effect of that statute is most important are the neighborhoods that Mr. Mangello asked the court to protect by expanding the justification defense beyond, as he recognizes, what any decisions of this or any other court would permit. What we have here, I interpret differently, addressing an appeal, I think, to the court's mercy, perhaps. But we have, if you believe the defendant, an unjust verdict of acquittal at the end, at the beginning of 2002 with respect to his case. The reason that it is so important that the narrowly construed and parsimoniously applied justification defense remain what it is, is that we not have unjust acquittals based on reasons that have nothing to do with the evidence and the law in the cases. The district court here heard the evidence and found, as has been conceded today, that the threat was not imminent, and therefore, also because the defendant did not avail himself of alternatives, it did not apply. Mr. Olson was shot by someone. He testified against this person. And then within 24 hours from the time that he is arrested, he receives a threat, not a direct threat, but a threat from the same person. And I think any of us would be very concerned. Maybe he was not in a position to move to California or Florida or some other place. He had to live in the neighborhood where he was. How realistic are these, quote, alternatives to protecting oneself in an area where guns may be prevalent? If they are not effective, then, of course, these areas cannot be disarmed. The reason that we have the Felon in Possession statute, which is so unyielding and requires only knowing possession, is to disarm these very places where felons predominate. We're with you 100 percent on that. So Mr. Olson just has to take his chances. Mr. Olson, under the law, has to take reasonable measures without resorting to possessing firearms. He may not arm himself here in advance of a confrontation that he feared. And the moving to California, of course, is something that might be reasonable. Moving out of the neighborhood is reasonable. But here, he went to first his girlfriend's home. When he was at that home, neither he nor she made any attempt to contact any authorities that might be of any aid to him. He then went to his mother's home, and his mother had persuaded him to participate in the prosecution, which made him fearful now. At his mother's home, neither he nor she nor anyone else made any contact with any authorities whatsoever. His only claim was that the police had previously, it must have been eight months earlier, denied him protection without any statement of what that protection might have been. He dealt with the district attorney's office. He never contacted the district attorney's office. He didn't do any of the things that a reasonable person in fear might do before they picked up a gun. So the defense of justification is a common law defense. It's been long recognized. And in the context of the felon in possession statute, it has been consistently, without any exception, interpreted in the manner in which Mr. Mongello said, to require the immediate emergency need for intervention to reach for the gun. This man did not reach for a gun. He went to different places and then retrieved a gun and then went right out to where he said he believed he was most at risk. Now, what if he had contacted the district attorney's office and they would say, well, if you want to swear out a complaint against a threat of deadly force, that's fine. Otherwise, we can't help you. And let's say he also went to the local police department and said, look, this guy is out to get me again. He already shot me once. Protect me. And they said, well, if you want to swear out a complaint, that's one thing. But we can't put a 24-hour guard in front of your house or have somebody walk around with you. Had he done those kinds of things and then availed himself of self-help, would that put this case in a different category? Or are we still back where with the argument that you just can't do it? If he had done enough to demonstrate that in his particular case, any additional means would have been futile, which is what the case has characterized Gomez, which is the case that Mr. Mangello relied on in his brief. Had he demonstrated the futility of these efforts, then he might have a justification defense. But he didn't even come close to that here. In Gomez, the defendant went to the federal authorities who had recruited him, who had accepted his volunteering as an informant. He went to his parole agent. He went to the sheriff. He went to churches. He went to the newspaper. He then got himself incarcerated by pretending to have violated his parole where he was threatened. That's the kind of case that demonstrates futility. We may be frustrated with civil society's capacity to enforce civil behavior, but we don't correct that difficulty by creating a new justification defense that's never been recognized in the law in the context of felon and possession cases. I submit to the court that the policy results of this defense of deterring people from picking up a gun instead of picking up a telephone or appealing to community groups, churches, others for aid in these kinds of situations is exactly the direction in which we want society to be driven. If Mr. Mangiello could cite any cases, I haven't found them that would say that we should mold the justification defense to take into account a kind of wild west way of living in some neighborhoods. The felon and possession statute says check your gun at the door. Your policy arguments are irrefutable, but probably as a practical matter, only the imminence standard is likely to avail anyone in this circumstance. Even then, it may be highly problematic, but it's not an easy situation. It's not easy for anyone. Frequently, our irresponsible and dangerous members of society expose themselves to danger. One weeps for that, but it's the obligation of the justice system to enforce the law as it is. I think in this circumstance, it's enforced in a just way. The sentence, Judge Randell here, was driven by the mandatory that applied because of the defendant's criminal history. That's where he got himself the sentence that was imposed here, which he would have received had he gone to trial. Judge Davis, I was not trial counsel, was not counsel at sentencing, but Judge Davis' remarks to this defendant about not believing him, even though he had to pretend to believe him for purposes of a motion, suggest that he was not going to lean over backwards to mitigate a sentence. Under Rule 3553, in a felon in possession case in which the defendant has not earned a mandatory sentence, the Rule 3553 factors would include consideration of the circumstances of the offense if believed. I think the narrative of how this man was arrested suggests that that wasn't what was happening at all here. But if the defendant were believed, then the justice system can react to mitigate the sentence, so long as he hasn't already earned a sentence that's not mitigable. But he wouldn't be a felon in possession. I mean, this is the very kind of crime where he's definitely going to have a mandatory minimum, and probably the judge can't take it into account, which is sad. If he's an armed career criminal, he'll have a mandatory minimum. If he has only two or fewer qualifying offenses, the maximum is 10 years, and the guidelines are typically below 10 years by about 30 months. So the sentence that we have here has to do with this defendant's history. Thank you, Your Honor. Mr. Henson, thank you very much. Mr. Mungello? No, Your Honor, I have nothing further to say. I just thank you for the opportunity to be here. Thank you. Good. Well, counsel made extremely good arguments. We thank you both, and we will take the matter under advisement. Thank you. The court stands adjourned until the 3rd of December, 2018. Thank you.